J-S76044-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: T.W. | : IN THE SUPERIOR COURT OF |
| | : PENNSYLVANIA |
| | : |
| APPEAL OF: T.W., NATURAL MOTHER | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : No. 1139 WDA 2018 |

Appeal from the Order Entered July 11, 2018
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000203-2017

BEFORE: BENDER, P.J.E., KUNSELMAN, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:                **FILED JANUARY 03, 2019**

T.W. (Mother) appeals from the decree involuntarily terminating her parental rights to her minor child, T.W. (born July 2016) (Child) pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b) of the Adoption Act.[1]  After careful review, we affirm.

The Allegheny County Office of Children, Youth, and Families (CYF) has been involved with Mother since June 2012, when Mother was adjudicated dependent as a minor child.[2]  **See** N.T., 6/13/18, at 7.  Mother was placed with a maternal aunt, T.E., in Georgia.  **Id.**  However, in April 2016, T.E.

_____

[1] The trial court terminated the parental rights of S.G. (Father) on July 11, 2017.  He has not appealed separately and is not a party to this appeal.

[2] Although Mother is currently over the age of eighteen, she is still a dependent youth.  Mother has been diagnosed with an intellectual disability and her intelligence quotient (IQ) has been variously assessed between 61 and 81.  **Id.** at 87, 115.

reported to CYF that she could no longer care for Mother due to Mother's pregnancy. *Id.* Mother returned to Pittsburgh in May 2016, where she was placed in a group home. *Id.* Prior to Mother giving birth, the group home informed CYF that Mother had stated she was unable to appropriately care for a child and had never cared for a child before. *Id.* at 9. Mother was enrolled in parenting resources, including the Baby Alive program, but was only able to successfully complete 67% of the program. *Id.*

Mother gave birth to Child in July 2016, and CYF has been active with Child since his birth. *Id.* Father, who has a criminal record and lives in Georgia with his paternal grandmother, was not present, nor was he involved in a relationship with Mother. *Id.* at 12-13. Child was released to Mother's care upon discharge from the hospital. *Id.* at 10. As noted, Mother had been referred to parenting resources, including Genesis, the Baby Alive program, and a visiting nurse. *Id.* at 8. Nevertheless, a day after being discharged with Child from the hospital, Mother's group home reported to CYF that Mother was unable to wake up overnight to feed Child, and had not practiced safe sleep habits with him. *Id.* at 11. CYF obtained an emergency custody authorization, and removed Child from Mother's care. *Id.* Child was placed in a foster home. *Id.*

Child was adjudicated dependent on October 17, 2016. At that time, Mother required significant prompting to care for herself and Child. *Id.* at 13. She required prompting to feed Child on a regular basis, to follow a feeding schedule, to recognize signs Child was hungry, to properly hold Child and

support his head, and to use safe sleep practices. *Id.* at 13. Mother still struggled with feeding and changing Child throughout the night. *Id.* At the time of Child's adjudication, Father continued to reside in Georgia. *Id.*

Mother was permitted visitation with Child Mondays, Tuesdays, Thursdays, and Fridays for two hours, and overnights on Saturdays and Sundays. *Id.* at 14. At the time, Mother was receiving parenting education, instruction, assistance, and independent living skills training through Achieva, a non-profit organization supporting individuals with disabilities. *Id.* Additionally, Mother received mobile therapy, and had a support coordinator through the Office of Intellectual Disabilities. *Id.* at 17. Although Mother completed a parenting skills class through Arsenal, Mother still required additional parenting assistance. *Id.* at 18. Mother hoped to participate in a program called Life Sharing, where she could reside in her foster home with Child, but the funding for the program was unavailable to her until she attained the age of 21. *Id.* at 62.

On November 16, 2017, CYF petitioned for termination of Mother's parental rights, asserting that Mother had failed to complete and/or make sufficient progress toward the goals outlined in the family service plans and court orders. *See* Pet. for Termination, 11/16/17, at 3-4. Specifically, CYF petitioned for termination under Section 2511(a)(1), (2), (5), (8), and (b). *Id.* at 5-6.

The court convened hearings on June 13, 2018, and July 11, 2018. Hannah Shankle, the CYF social worker, and Dr. Terry O'Hara, a psychologist,

testified for CYF. Mother testified on her own behalf. Child was represented by legal counsel, who averred that it was in Child's best interests for Mother's parental rights to be terminated.[3]

Ms. Shankle testified that during the two years of Child's life, Mother was unable to demonstrate progress in alleviating the issues that caused Child to be removed from her care. N.T., 6/13/18, at 24. At the time of the termination hearing, Mother still had all support services in place, but had not progressed with addressing her parenting deficits. *Id.* Mother's original goals were to maintain visitation with Child, work with the Achieva parenting program, work with her support coordinator through the Office of Intellectual Disabilities, work with her joint planning team, be involved in all of Child's educational and medical needs, attend the Arsenal parenting program, and address any additional mental health concerns. *Id.* at 28. In March 2018, an another goal was added for Mother, namely, that she address substance abuse issues following her foster mother's report that Mother was abusing marijuana or a synthetic version of marijuana. *Id.* at 28-29.

_____

[3] We briefly address, *sua sponte*, the representation of counsel. *See In re: K.J.H.*, 180 A.3d 411, 412-414 (Pa. Super. 2018). The Pennsylvania Supreme Court has held that legal counsel must be appointed to represent a child's interests in a contested termination proceeding. *In re Adoption of L.B.M.*, 161 A.3d 172, 183 (Pa. 2017) (plurality). However, a GAL may serve as counsel where there is no conflict between a child's legal and best interests because the child is too young to express a preference. *See In re T.S.*, 192 A.3d 1080, 1092-93 (Pa. 2018). Here, Child's legal counsel argued that termination was in his best interests. However, Child, who was approximately two years old, was too young to express his preferences and, accordingly, we need not remand for further proceedings. *Id.*

Ms. Shankle further testified that Mother was not compliant in meeting her mental health goals. *Id.* at 29. Mother had suffered physical and possibly sexual abuse at the hands of her mother and her mother's paramours, and was diagnosed with depression, anxiety, and post-traumatic stress disorder (PTSD). *Id.* at 30. As a result of her PTSD, Mother suffers from flashbacks, nightmares, and insomnia; in February 2017, she reported an episode where she was hallucinating and saw the face of her biological mother in the face of her foster mother and suffered physical pain reminiscent of abuse she had suffered in the home. *Id.* However, although she completed mobile therapy, Mother was discharged from trauma-based outpatient therapy due to noncompliance. *Id.* at 31-32.

In February 2017, Mother, while suffering from an increase in trauma-based symptoms, took Child and fled from her foster home, leaving a note saying she could no longer take her foster mother telling her what to do. *Id.* at 39-40. Mother was found five days later in the home of her biological mother. *Id.* at 40. Foster mother asked Mother to remain in her foster home, but Mother stated she would not, and subsequently was placed in a group home where Child could not have visits with her. *Id.* at 41. Accordingly, visitation was reduced from overnights to twice a week for two or three hours, supervised by Achieva. *Id.* at 41-45. Eventually, after Mother was placed in another foster home, Child was able to resume overnight visitation three times a month. *Id.* at 45. At supervised visits, Mother still required hands-on

prompting to meet Child's needs and welfare. *Id.* at 46. Mother was unable to redirect Child when he acted in a potentially "injurious manner" or destructively. *Id.* at 50.

Ultimately, Ms. Shankle testified to CYF's position that the agency had worked hard toward reunification and to assist Mother in her parenting skills and parental deficits. *Id.* at 54. However, based upon Mother's failure to attain proper parenting skills, she lacked the capacity to safely parent Child. *Id.* Even with the implementation of multiple services, Mother's visits with Child required "intense" supervision. *Id.* at 55. Ms. Shankle averred that Child's needs and welfare would be served best by permanency and stability with a caregiver who could appropriately care for him. *Id.* Child receives appropriate care in his foster home. *Id.* at 53. His foster mother meets his emotional, physical, and mental needs; he refers to her as "mom." *Id.* at 52-53. Additionally, Child has special needs, including a sensory issue where he does not appear to register pain, and he has shown early symptoms of autism. *Id.* at 48.

Dr. O'Hara performed an individual evaluation of Mother in February 2018, as well as interactional evaluations with Mother and Child, and Child and foster mother.[4] *Id.* at 113. Dr. O'Hara noted that Mother had graduated from high school and was attending culinary school, was attending therapy,

---

[4] Dr. O'Hara also produced an expert report regarding these evaluations, but the report is not contained in the certified record.

had not been involved in abusive relationships, had no criminal record, and did not have a substance abuse issue at the time. *Id.* at 114. However, Mother did not assume responsibility for the circumstances leading to Child's removal, and believed she had done nothing wrong; accordingly, she had little motivation to make changes. *Id.* Dr. O'Hara also expressed concerns regarding Mother's mental health and history of three psychiatric hospitalizations, and her IQ, which he described as in the borderline range or mild mental retardation range of IQ. *Id.* at 115-16. Dr. O'Hara also noted Mother's history of conflicts, including ongoing arguments with her current foster mother that would make long term placement unlikely to be successful. *Id.* at 119.

Dr. O'Hara noted that Mother exhibited some positive parenting traits, including encouraging Child's language development, praising him, and directing and redirecting him. *Id.* at 120. However, Mother was unsure of Child's developmental needs, including her description of Child as screaming and crying for no reason. *Id.* If frustrated, Mother needed to hand Child to another adult so she would not take her anger out on him. *Id.* at 121. She did not know how to deal with Child's outbursts and had unrealistic expectations of him. *Id.* She had not made meaningful gains during the time Child was in care despite the services available to her. *Id.* Dr. O'Hara opined that Mother remained at risk of physically abusing Child if he were placed into Mother's care without supervision. *Id.* at 122. Finally, Dr. O'Hara expressed

concerns regarding the feasibility of long-term placement of Mother and Child with Mother's foster mother, who did not believe that constant supervision of Mother was necessary. *Id.* at 120-130. Ultimately, Dr. O'Hara's opinion was that Child's needs and welfare would be served best by termination, although he recommended an open adoption. *Id.* at 126, 130.

Mother testified that although she has needed help with parenting in the past, Child's behavioral issues have improved, and her own deficits were due to the high doses of medication she had been prescribed. *Id.* at 93-95. Mother admitted to requiring help when supervising Child. *Id.* at 98. She denied abusing marijuana. *Id.* at 99-100. Mother attends therapy at Milestone every two weeks. *Id.* at 104. Mother stated she did not know how to care for a baby on her own so she did not want to move out of foster care. *Id.* at 105.

At the conclusion of testimony, the orphans' court terminated Mother's parental rights and changed Child's permanency goal to adoption.[5] Mother timely appealed and filed a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Mother presents two questions for our review:

> 1. Is the trial court's finding grounds for involuntary termination of [Mother's] parental rights under 23 Pa.C.S.A [§ 2511(a)(2), (5), and (8)] proven by a showing of clear and convincing evidence?

---

[5] Mother did not appeal the goal change order.

2. Is the trial court's finding that termination of parental rights serves the developmental, physical[,] and emotional needs and welfare of the Child as proved by clear and convincing evidence as required by 23 Pa.C.S.A. § 2511(b)?

Mother's Brief at 6 (unnecessary capitalization and answers omitted).[6]

We review cases involving the termination of parental rights according to the following:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotations omitted).

Termination requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the

---

[6] Mother's brief was due October 15, 2018. *See* Order, 9/13/18, at 1. On October 18, 2018, CYF filed a motion to dismiss Mother's appeal due to her failure to file a brief. In lieu of a response, Mother filed her brief the next day, on October 19, 2018. Where an appellant has failed to file any brief, we have quashed the appeal. *See Moore v. Moore*, 568 A.2d 250 (Pa. Super. 1990). However, as the untimeliness of Mother's brief has not affected our ability to conduct meaningful appellate review, we decline to dismiss the appeal, and deny CYF's motion. *See In re W.H.*, 25 A.3d 330, 334 (Pa. Super. 2011).

needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). As CYF argues that it proved by clear and convincing evidence that grounds for termination existed under 23 Pa.C.S.A. § 2511(a)(2), we focus our analysis on subsection (a)(2) and (b).

The relevant subsections of 23 Pa.C.S.A. § 2511 provide:

**(a)  General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*\*\*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

To satisfy the requirements of § 2511(a)(2), the moving party must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *See In Interest of Lilley*, 719 A.2d 327, 330 (Pa. Super. 1998). The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied. *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010). Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties. *Id.*

Instantly, Mother argues that CYF did not prove by clear and convincing evidence that grounds for the involuntary termination of her parental rights existed. *See* Mother's Brief at 10. Specifically, with regard to Section 2511(a)(2), Mother argues that she has consistently worked with CYF and the numerous services provided to her to address her intellectual, emotional and parenting issues. *Id.* at 12. Mother notes that she would be eligible to receive funding for the Life Sharing program in approximately two years, and has already made progress in her parenting skills. *Id.*

Mother's arguments are belied by the record. CYF presented ample evidence that, despite Mother's participation in the services offered to her, after more than two years, she has not progressed with obtaining the skills necessary to safely parent Child. Even after completing parenting classes, Mother requires 24 hour supervision and hands-on prompting during her visits

with Child; she is not able to redirect him if he is acting destructively or in a potentially injurious manner. Further, Mother acknowledged she still requires assistance and expressed ambivalence about whether she would be able to parent Child without supervision in the future.

In addition, Dr. O'Hara expressed two primary concerns regarding Mother's parenting abilities. First, he noted that Mother did not accept responsibility for the circumstances that led to Child's placement and did not believe she had done anything wrong. Accordingly, she lacked motivation to make positive changes. Second, Dr. O'Hara noted that Mother still had difficulty dealing with her anger and frustration, particularly where Child was involved. During visitation, when Mother was frustrated with Child, she would hand him to another adult. She did not know how to deal with Child's outbursts and had unrealistic expectations of him. Dr. O'Hara expressed concern that this combination of factors placed Mother at risk of physically abusing Child if he were placed into her care without supervision.

In determining that termination was warranted, the orphans' court explained:

> Since November 2016, Mother has made some progress in her parenting skills, but Mother still requires 24/7 support in place to meet [Child's] health, safety, and welfare needs. It is concerning that Mother has not made more meaningful progress despite working with the numerous services offered by [CYF] for such an extended period of time.
>
> This [c]ourt has concerns about Mother's lack of a willingness to accept responsibility for her actions, which led to [Child's] placement and continuing need for foster care. Mother maintains

- 12 -

she did not do anything wrong and blames her deficiencies on outside causes. Mother acknowledges needing assistance in caring for [Child], but Mother does not seem motivated to make substantial changes in her life to be able to care for [Child].

This [c]ourt also believes Mother would benefit from increased mental health treatment. She often argues with [foster mother] and admits having difficulty understanding what others are saying to her, which reflects upon her intellectual disability. She is unsure about [Child's] developmental needs and claims the child cries and screams for no reason.

This [c]ourt believes Mother has good intentions and wants to be with her child. However, despite being given every opportunity, Mother has simply not developed the necessary parenting skills to make that a viable option. The testimony and evidence presented by [CYF] was overwhelming that Mother cannot handle the demands of raising a child. [Foster mother] has agreed to be a life-sharing option which would allow [Child] to be placed in Mother's care, but Mother is not eligible for that service until she is 21 years old. Life-sharing . . . does not seem realistic for this case.

Trial Court Opinion, 9/12/18, at 3-4.

Consistent with the foregoing, we discern no error in the orphans' court's finding that competent, clear, and convincing evidence supported the termination of Mother's parental rights pursuant to Section 2511(a)(2), based upon Mother's continued incapacity – her inability to develop the appropriate parental skills and the unlikelihood that Mother would develop such skills – that resulted in Child being without essential parental care, the cause of which "cannot or will not be remedied." *See Lilley*, 719 A.2d at 330; *Z.P.*, 994 A.2d at 1117.

Next, we consider whether Child's needs and welfare will be met by termination pursuant to Subsection (b). *See Z.P.*, 994 A.2d at 1121. "In this

context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *Id.* The court is not required to use expert testimony, and social workers and caseworkers may offer evaluations as well. *Id.* Ultimately, the concern is the needs and welfare of a child. *Id.*

> We have stated:
>
> Before granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of the relationship is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child's needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parent's rights would destroy something in existence that is necessary and beneficial.

*Z.P.*, 994 A.2d at 1121 (quoting *In re C.S.*, 761 A.2d 1197, 1202 (Pa. Super. 2000)). The trial court may equally emphasize the safety needs of the child and may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. *See In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011). Additionally, the court may emphasize the safety needs of a child. *See In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super. 2008). Where there is no evidence of a bond between the parent and child, it is reasonable to infer that no bond exists. *Id.* "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe

- 14 -

environment." ***In re B.,N.M.***, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

Here, the orphans' court stated:

When I balance it all out, based on the fact that it doesn't appear that the appropriate parenting skills can be achieved, and even though there has been some improvement, it is not to the point where mom can do this on her own, I really believe at this point in time that it is in the best interest to terminate the parental rights.

N.T., 7/11/18, at 46.

Finally, the record reflects no evidence of a bond. Child was removed from Mother's care shortly after his birth, and was never returned to her care. He remains in foster care, and Mother remains unable to safely parent him without intensive supervision. It is thus reasonable to conclude that no bond exists between Mother and Child. ***K.Z.S.***, 946 A.2d at 763. The CYF caseworker, Ms. Shankle, indicated that it was in Child's best interests for Mother's parental rights to be terminated so that Child could find safety and stability in adoption. The orphans' court credited that testimony. We discern no abuse of discretion in that conclusion. In sum, clear and convincing evidence supports the trial court's termination of Mother's parental rights with respect to 2511(b), where adoption would best serve Child's needs and welfare. ***See Z.P.***, 994 A.2d at 1126-27; ***K.Z.S.***, 946 A.2d at 763.

For the above reasons, we affirm the trial court's order.

Motion to dismiss denied. Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/3/2019